You want five minutes for rebuttal, right? Yes. Okay, you may proceed. To please the court, I would like to present three main issues in this appeal. The first issue relates to legal error by the PTAB for finding that the combination of Nathan-255 and Nathan-259 disclose all of the limitations in the challenged claims. Second issue is that PTAB erred in finding sound blasters to be prior art. The third issue I would like to discuss is that the PTAB didn't show or didn't base its opinion on the fact that the sound blast, excuse me, on the fact that a person of ordinary skill in the art had the necessary skill to make the combination of the functionality of sound blaster with Lucente and Ozawa references. So on that last point, are you saying that there was no evidence of a motivation to combine or are you saying that that it wouldn't even be functional or that they wouldn't have been capable of combining? I'm saying that they wouldn't be capable. In the Nathan references, do you agree that the cue is a list of titles and song related information? No, we don't. The teachings in Nathan, which I can point out, basically say that the cue is a place in memory where the songs themselves are stored. That's actually disclosed in 160 in Nathan 259, which is on page APPX 496. And so you believe that the board's conclusion to the contrary was wrong? Yes, Your Honor. There are a lot of things here that you believe the board got wrong. Yes. Do we have to conclude that you are correct on every single one of those for you to prevail? No, Your Honor. The court only has to conclude on two out of three items. And the first item has to do with the combination of Nathan 255 and 259. The second issues both deal with the combination of Lucente, Ozawa, and sound blaster. So if the court ruled in our favor on one of the two of sound blaster or the combination, we could prevail. All right, so is it, with respect to sound blaster, is it critical that we find sound blaster was not prior art? Yes, Your Honor. Okay, so we would have to conclude that that HTC's declarence testimony was insufficient for purposes of saying that the sound blaster manual was prior art. Or alternatively, that a person of ordinary skill in the art of cosina didn't have the necessary skill. So one of the rulings in our favor on one of those two issues would prevail on the second ground of invalidity, which is based on sound blaster, Lucente, and Ozawa. Okay. Doesn't this sound blaster document corroborate itself in the sense that it, A, it doesn't say draft and it does have a copyright notice? Yes, Your Honor, but we're not contesting the content of the sound blaster manual. What we're content is the actual, whether the sound blaster document was publicly accessible prior to the effective the date. We're not challenging the date, the copyright date, we're just challenging that there's no corroborative evidence that the manual was publicly accessible prior to the effective filing date of AAD's patents. Well, isn't that what the witness testified to? The witness, the declaration of the witness was not probative of the public accessibility. The witness indicated in his declaration that up until 1990... Wasn't he a member of the public? He was an employee at the time he received the sound blaster manual, and that's in his declaration. Our contention is that he just received an internal document for review. Okay. But that's not what he said. He said he received it in an off-the-shelf package that would have been typical for a customer to get. So he's not saying he got it as a employee, he says this is what the customers would have gotten. But there's no corroboration that this... What corroboration do we need? I mean, he testified under oath that what he received is exactly the same thing that would have been commercially sold at the same time. But he had no basis for making that statement because, number one, he was not involved in the commercial and in packaging these sound cards with manuals. He started off, he worked in a call center. Well, did you challenge the admissibility of that declaration? We did. And you lost on that, right? You lost on that, so it's in the record. We did. Are you asking us to review that evidentiary issue? No. So we have this statement in the record that supports the board's decision. I mean, I don't understand how this is an issue. It's substantial evidence. What we're challenging... You don't like the statement, you think there should be more, but I mean, is there a legal requirement for stuff like this to be corroborated? Yes, there is, Your Honor. Where does that come from? Where does that come from? There's actually two cases. One is Finnegan and the other one is Union Carbide. It requires that activities associated with documents must be corroborated by more than a single reference. No, but Finnegan is a different case. The witness was testifying about whether something was missing. It's a different case, but Finnegan related to whether something was in the public and his testimony wasn't corroborated. That's basically right on point here. Can we go back to Nathan? Yes. You said to me that the cue is the songs, not the titles, not the list. Tell me, and you said it was in paragraph 58 and 60, I think you said, where does it say that? Where does it make it clear that it's the songs themselves? Should I read it to you? Point to me the portions of those paragraphs. Okay, what page are we on? 196. Okay. Halfway down, or actually a third of the way down paragraph 58. A second smaller window, 92, included in the first window, 90, allows graphics displays of the disc jacket during performance. In the next sentence, is the key one, in numeric display 93, the total time corresponding to the pieces to be played which are stored in the cue is indicated. In the next sentence, the number of songs in the cue. Okay, paragraph 60, if you'd like me to read that. In the case in which the jukebox is not playing a song when the songs of the cue have been exhausted. Yeah, but does that necessarily exclude a separate storage for songs? I don't know if I understand your question, Your Honor. I mean, if you're saying that songs are stored in a cue, but that doesn't necessarily mean that songs can only be stored in a cue. They could be stored somewhere else. The only disclosure brought into the case is that they're ready to be played. The only disclosure in Nathan 259 is that they're only stored in the cue. There's no other disclosure in this document that says they're disclosed. What about the fact that there was actually expert testimony that said that one of skill in the art would have understood this to be referring to the songs that that correspond to the list in the cue? If I understand your question, you're saying not the songs are stored, but basically a also expert testimony to the contrary, and the document is contrary and basically states the songs are stored. There are other sections of Nathan 259, for example, paragraph 9, and that's on APBX 489. Another object is to devise an apparatus which allows selection of audio or video or audiovisual data to be downloaded, enable this information to be reproduced on the audio and video systems. So basically what that paragraph is saying is you're downloading songs from a remote server and they're able to be played while they're being downloaded. Okay, and that very clearly shows that the songs are stored in the cue. Another paragraph 103. At the bottom of paragraph 103 on page 506, it states it can even play the audiovisual pieces during transfer. Okay, so what that tells you is they're not stored somewhere else before being played. They're directed right into the cue and played. That's the evidence. What about paragraph 8 on page appendix 489? Paragraph 8, it says the object, this object, that's referring to paragraph 7, which says an object to devise a device which allows the user to develop a design allowing storage of plurality of audio or video information. Then 8 says this object is achieved by a second mass storage module 108, allowing the recording of plurality of digitized audiovisual data. Doesn't that suggest that songs are also stored in that mass storage module? I'm glad you asked that question, Your Honor. The storage module 108 is external to device. The claims do not read on devices that are external to the local audiovisual device. So this is, and secondly... But isn't it a teaching though? It's teaching. The PTAB didn't rely on this particular module in support of its finding. You're into your rebuttal. You want to save it? Yes, Your Honor. Okay, I know there's a lot of information. Let's start where he left off. Why is it that the PTAB could credit an expert who says that these paragraphs don't say what they appear to say on their face with respect to the storage of the songs? So, I think that the paragraphs actually do state what HGC's expert, Schmantz, said. I apologize, Matthew Bernstein IV. That's okay, I jumped right in. May it please the Court. The basis of the board's decision that there was memory internal storage in the actual Nathan 259 reference was expert testimony from Mr. Schmantz, and the board's giving credit to that expert testimony that there were two modes. This is the starting point of the, both in the decision, final written decision, and in the order denying the request for re-hearing, that there's this NSAM mode, and then there's this separate browsing and selection mode, and how this works, and there's detail that misses in the final written decision, is that the music jukebox of the Nathan 259, it goes on to a server, selections are made of some songs, and those songs are downloaded to the actual music jukebox. Stop. That has happened. That's one mode of the queue at that time, because the second mode, the selection mode, you have to hit a separate button, you have to look at a bunch of songs, and then you have to actually select and push a button to put something actually into the queue, and the board looked at these two modes, and then looked at the disclosures in the 259, which actually do talk about whether it's RAM or mass storage, and based on that combination of evidence, found that there was substantial evidence, and what AAD is doing, what they did in the request for re-hearing, and what they're doing now, is they're just, you know, asking, re-arguing the facts, re-making factual arguments that they made, when there's substantial evidence supporting the board's decision. Well, do you, I guess my question is, I understand that the board points to the expert testimony. What I'm trying to figure out is, what was the board looking at in Nathan itself, to support the conclusion of two separate methodologies? So, that's at appendix page 16, or page 16 of the modes, and then... Yeah, but I guess what I'm trying to figure out is what language of Nathan it's relying on. It does say, I mean, at 18, it says, upon review of the disclosure of Nathan and the testimony of the party experts, we find that AAD's interpretation of this reference is the correct one, but I guess I'm looking for the first part. What in Nathan? So, so, it's actually further down on page 16 of the appendix of the model written decision. The paragraph that starts, we find that Nathan 259 discloses a jukebox that permits downloading of soundtracks via the NSAM. That's going to the server to download songs initially, and then it goes on a different selection graphic screen, shows the songs that have been downloaded, permits the user to sort the songs according to different criteria, and then gives the user the ability to add the song to the queue. That's the discussion of the two modes, and in the reference, there's citations to paragraph 64, 73, and 74, figure 9 and figure 10 of the Nathan reference. And then this factual disagreement that AAD had with what the appropriate reading of Nathan was, they sought requests for rehearing on that, and again, at appendix page 209, the board was very clear that they were relying on the disclosure of Nathan 259 having both the NSAM mode as well as the selection mode, two separate modes. But the board also did independently point to memory actually being local storage being resident in the Nathan 259 reference. And let's not forget that the actual combination was the Nathan 259 and the Nathan 255, and we believe that the PTA, Nathan Independent Factual Findings, that the 255 disclosed internal storage by means of 350 to 400 titles that could be stored in the reference. Your Honor, turning to Sound Blaster and whether or not this is prior art, just a couple points that I wanted to add. The first is Mr. Miller's declaration. He clearly said that he received the box of software, including the disc and the manual and the sound in the regular course of his business at Creative Labs. So this was something received in the ordinary course of business. He was never cross-examined. So this is the equivalent of Mr. Miller getting up at trial in front of judge and jury and saying, hey, here's the box of software. This is why it was publicly available. I received it in the regular course of business. That's my direct examination. I sit down and there's absolutely no cross-examination. Did he ever actually say that he was familiar with the commercial practices as it relates to this manual? He said, I mean, he said, I got this. No, he said more than he got it, Your Honor. He said that he received it in the regular course of business. And more so than that, he said that the reason why he received the actual commercial publicly available version of this software is because he was working in technical support and it was the company policy to send the commercial versions of the software to people like him. So when they talked on the phone to these customers, they were looking and working off of the same reference. Did he ever say that he ever did talk to any customer or anyone about this software? No, there's no testimony of that. I mean, what HCC did was, through this declaration and testimony, make an initial showing. And perhaps if AAD had cross-examined him and asked him that question, that would be something to consider. But the only evidence, the substantial evidence, is the testimony from Mr. Miller about him receiving the software in the regular course of business and it being exactly the same as what was available. What page of the appendix were you on? I'm sorry, Your Honor, 586 to 587, paragraphs 12 through 14. The procedure that you described and that the board described is a sound engineer, right? Uh, that would meet the requirements of a person of ordinary skill in the art at the time of the invention. Okay, but it wouldn't, now we're getting to this argument that your friend on the other side made, that the sound engineer wouldn't have any idea how to do this because what you really need is a software engineer. Well, so, a couple points in response to that, Your Honor. First, the evidence presented to the board on motivation to combine, there was HTC's evidence through Mr. Schmantz and their argument, positions that they took, that a person of ordinary skill in the art would have been motivated to combine the teachings. Right, but wouldn't have had any idea how to do that. So that's what my problem is. If you've got a posita who can't do it, who has to contract it out, or there has to be a separate posita, so how would that be the one of skill in the art would know this? So the only dispute as to whether a person of ordinary skill in the art at the time of the invention could have actually combined references related to the physical combinability of the references. That was AAD's argument that if you, you know, a person of ordinary skill in the art wouldn't have known to take the actual card from Sound Blaster and put it into Lucente, or a person of ordinary skill in the art wouldn't know how to take Windows, a version of Windows. Right, that's exactly my point, because a person of ordinary skill in the art as you defined it was a sound engineer, and what you're talking about is something that software engineers would have to do. But the physical combinability is not the test for motivation to combine, the test is combining the actual teachings of the. Right, but the test is can this one of skill in the art, would this one of skill in the art have been motivated to that and wouldn't even have any clue how to do that? Where does the motivation to do it come from? Well, so for the actual combining of the functionality of Sound Blaster with Lucente, which was the actual combination that HTC set forth, the board actually did look to see whether there would have been a reasonable expectation of achieving what's claimed in the patent. The board talked about that in the final written decision at page 37, so page 37 of the appendix, and it relied on Mr. Schmitt's testimony at paragraph 71 of his declaration, which is appendix 2416 through 2417, where Mr. Schmitt did testify that it would have been straightforward for any sort of the software for this basic functionality, and that's all it is. We're talking about playing a song, we're talking about creating a playlist, that combining that basic functionality with a device such as Lucente that actually had... So you're saying that a sound engineer at the time would have the ability to do all of this software engineering? Yes, so yes, that's what Mr. Schmitt testified to at the appendix 2416-2417 that was adopted by the court, and AAD never responded to that. AAD never said, never provided any opinion as to whether a portion of Ordinary Skill in the Art could combine and would be successful in combining the functionality, this basic functionality, with the Lucente reference. They didn't respond to that. The only evidence before the PTAB was HTC's expert testimony. AAD instead just argued combinability of the physical combinability of the references. They provided, I mean, the board twice said, AAD, you provided this testimony, it's completely irrelevant because HTC's combination is the functionality, this basic functionality of SoundBlaster with the Lucente audio device. You don't say anything in your brief about what the need in the industry was that might have given rise to this incentive to combine SoundBlaster, Lucente, and Ozawa. So the board actually addressed this, the kind of the problem facing a person of Ordinary Skill in the Art at pages appendix four through five, where the board actually described the problem similar to what I've been saying, is that the ability to, there was a need for the ability to store music on the recorder, customize the soundtracks, playlists, play audio. That's, again, that's pretty simple stuff. And when you're talking about the level of detail, how much information you need, when you're talking about simple technology like this, the personal web case says that you don't need a book or a long list of information. I think my time is up, Your Honor. Okay, anything else? Okay, thank you. Thank you, Your Honor. You have a little over two minutes for rebuttal. I'd like to address a few points. First, AAD's expert did address this issue of whether a two experts would have the necessary skill to combine the functionality of Sound Blaster with Lucente and Ozawa. Where would we find that? Page 87-12 and 13. And just to save some time, you start at the bottom, towards the bottom of 87-12. Thus, a person of ordinary skill in the art would not even consider such a modification or combination based on the fact that it was beyond their skill level. One of the points that was made was that AAD was suggesting physical combining. That's not the issue we're bringing up today. It's combining the functionality of Sound Blaster with Lucente and Ozawa. And our expert testified that it was beyond the skill of a POSITA as defined. PTAB ignored our expert's testimony and didn't even didn't rely on it or respond to it. One point of clarity. I would like to state that for the issues that we didn't get to cover today and the rest of the issues in the case, we rely on our briefs. Thank you. Thank you.